J-S66001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.S.W. AKA Z.S.I.W., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.W., FATHER | : | No. 1265 EDA 2019 |

Appeal from the Order Entered April 5, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-DP-0000129-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.S.W. AKA Z.S.I.W., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.W., FATHER | : | No. 1266 EDA 2019 |

Appeal from the Decree Entered April 5, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-AP-0000158-2018

BEFORE:  STABILE, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.:                    Filed: April 16, 2020

S.W. ("Father") appeals from the decree entered April 5, 2019, which terminated involuntarily his parental rights to his son, Z.S.W. ("Child"), born in January 2016.  In addition, Father appeals from the order entered that same

day, which changed Child's permanent placement goal from reunification to adoption.[1] After careful review, we affirm.

We summarize the relevant facts and procedural history of this matter as follows. The Philadelphia Department of Human Services ("DHS") filed a dependency petition with respect to Child on January 18, 2017. DHS averred that it became involved with Child at the time of his birth in January 2016, due to Mother's history of drug use and her prior involvement with the agency. DHS averred that it remained involved with Child throughout the first year of his life, which culminated in a failed attempt to obtain protective custody in December 2016. According to the dependency petition, DHS discovered that Child and Mother were residing with Father, whose home was inappropriate due to structural damage and safety hazards. When DHS arrived at the home, Father and Mother absconded with Child and subsequently failed to respond to the agency's attempts to contact them. The trial court entered an order adjudicating Child dependent on January 23, 2017. The order permitted Child to remain in Mother's care unless she tested positive for illegal substances or failed to attend random drug screens. DHS obtained protective custody of

---

[1] The trial court entered a separate decree, in which it terminated involuntarily the parental rights of Child's mother, H.Y. ("Mother"). Mother did not appeal the termination of her parental rights or the change of Child's goal.

Child on February 15, 2017, reportedly after Mother tested positive for PCP. The court entered a shelter care order on February 17, 2017.[2]

At the time of Child's adjudication of dependency, Father's whereabouts were unknown. Father was facing drug charges and a warrant was out for his arrest. N.T., 12/13/18, at 62. Father remained "on the run" until August 2017, when he finally turned himself in. *Id.* at 62-63. On March 2, 2018, DHS filed a petition to terminate Father's parental rights to Child involuntarily as well as a petition to change Child's permanent placement goal from return to parent or guardian to adoption. As detailed below, Father had no contact with Child from the time he entered foster care until a visit at the prison in September 2018. *Id.* at 45, 48-49.

The trial court conducted a hearing on the termination and goal change petitions beginning on September 24, 2018. Father remained incarcerated at the start of the hearing and participated via telephone. He was released from incarceration in October 2018 and he appeared in person during the next two days of the hearing on December 13, 2018, and April 5, 2019. Following the hearing, the court entered a decree terminating Father's parental rights to Child involuntarily and an order changing Child's permanent placement goal from return to parent or guardian to adoption. Father timely filed notices of

_____

[2] DHS filed an amended dependency petition on February 28, 2017, although Child was already dependent.

appeal on May 1, 2019, along with concise statements of errors complained of on appeal.

Father now raises the following claims for our review:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. §[]2511(a)(2)?

2. Whether [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. §[]2511(a)(5)?

3. Whether [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. §[]2511(a)(8)?

4. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S.A. §[]2511(b), that termination of [Father's] parental rights best serves the child's developmental, physical[,] and emotional needs and welfare?

Father's Brief at 5 (trial court answers omitted).[3]

We address Father's claims mindful of the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

---

[3] Father waived any challenge to the goal change order by failing to develop it in his brief and by failing to include it in his statement of questions involved. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority. . . . Further, it is well-settled that issues not included in an appellant's statement of questions involved . . . are waived."). Further, even if had Father preserved a challenge to the goal change order for our review, our decision to affirm the decree terminating his parental rights would render that challenge moot. *See In the Interest of D.R.-W.*, 2020 Pa. Super. LEXIS 54 at *23 (Pa. Super. filed Jan. 29, 2020) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees.").

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's

decision to terminate pursuant to Section 2511(a)(2) and (b), which provides

as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
>
> ***

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by considering whether the trial court committed an abuse of

discretion by terminating Father's parental rights to Child pursuant to Section

2511(a)(2):

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2)

such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Significantly, "a parent's incarceration is relevant to the [S]ection [2511](a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." ***In re A.D.***, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

Father argues that DHS failed to present clear and convincing evidence to terminate his parental rights involuntarily. Father asserts that he complied with his Single Case Plan ("SCP") objectives and made efforts to remedy the causes of Child's placement in foster care. Father's Brief at 12. Father also contends that DHS failed to make reasonable efforts to reunify him with Child. ***Id.*** at 10. Specifically, he asserts that DHS did not make reasonable efforts to notify him that Child was in foster care and did not inform him of his SCP objectives until September 2018. ***Id.*** at 12.

The trial court did not file an opinion explaining its decision to terminate Father's parental rights but instead issued a statement directing our attention

- 7 -

to its findings of fact on the record at the conclusion of the hearing on April 5, 2019. The court found as follows, in relevant part:

> With respect to 2511(a)(2), I will find that the repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal will not -- cannot or will not be remedied by the parent.
>
> Again, as I said, there were myriad of issues for this case: [i]nadequate housing; substance abuse; Father's incarceration shortly after [Child] came into care; Father's incarceration for most of the time [Child] was in care. With respect to some of the exhibits, I believe Father -- entered in as DHS Exhibit-4, was Father's criminal history. Father has a very lengthy criminal history that shows Father being in and out of incarceration.
>
> And so, while he is out now, given that he has been in and out of incarceration long before [Child] was even born, I have no reason to believe that Father can keep himself out of incarceration for enough time for [Child] to be able to be effectively reunified with him.

N.T., 4/5/19, at 27-28.

Our review of the record supports the trial court's decision. As explained above, the court adjudicated Child dependent in January 2017 and placed him in foster care in February 2017. At the time of Child's adjudication, Father's whereabouts were unknown. DHS attempted to contact Father by sending letters to his last known address. N.T., 12/13/18, at 12-13. However, Father had no communication with DHS. *Id.* at 12, 17, 21. Father testified that he "couldn't really come in to see" Child during that time because there was a warrant out for his arrest related to drug possession charges and he was "on the run[.]" *Id.* at 62. He stated that he did not turn himself in to the police

until approximately August 2017. *Id.* at 63. He remained incarcerated until October 2018. *Id.* at 64-65.

Importantly, as the trial court found, this was not Father's first criminal conviction. The record reveals that Father has an extensive criminal history dating back nearly twenty years. The court admitted into evidence a copy of Father's criminal history as DHS Exhibit 4. The exhibit indicates that Father has had repeated convictions of possession with intent to deliver a controlled substance, including convictions in 2000, 2007, 2011, and 2018. Father's status as a frequent recidivist supports the conclusion that he is incapable of providing Child with parental care and that he cannot or will not remedy his parental incapacity.

Father's criminal history is not the only factor indicative of his parental incapacity. At the time of Child's placement in February 2017, DHS did not believe that Father was an appropriate caretaker for Child based on his lack of appropriate housing. *Id.* at 17. After Father's release from incarceration in October 2018, he returned to the same home where he had resided prior to Child's placement. *Id.* at 61. Community Umbrella Agency ("CUA") case manager Lakesha Godwin testified that she evaluated the home after Father's release and that it remained inappropriate. *Id.* at 55. Specifically, the home had "exposed wiring" and needed repairs to the floor and ceiling. *Id.* There were also tools cluttering the home. *Id.* Father provided no clear explanation as to why the home remained inappropriate after over a year and a half, and no timeline as to when the necessary repairs would be complete. He stated,

"it's my dad's house . . . . And I've been trying to tell my pop . . . . It just -- he takes so long. He doesn't fix the house, so it's like -- he leaves open holes, well, whatever is supposed to be fixed. But it's getting fixed, though." *Id.* at 69. Father also insisted that he was not planning to stay at the home "that long" and that he would take Child to live at his sister's house. *Id.* at 81-82.

Finally, we reject Father's argument that DHS failed to provide him with reasonable reunification efforts. Father waived this argument by failing to include it in his concise statement and statement of questions involved. *See M.Z.T.M.W.*, 163 A.3d at 466 ("[i]t is well-settled that issues not included in an appellant's . . . concise statement of errors complained of on appeal are waived."). Even if Father had preserved this argument for our review, it would be meritless. Our Supreme Court has held that reasonable efforts are not a prerequisite to the involuntary termination of parental rights pursuant to Section 2511(a)(2). *See In re D.C.D.*, 105 A.3d 662 (Pa. 2014). Moreover, the whole premise of Father's reasonable efforts argument supports rather than contradicts the conclusion that he is incapable of parenting Child. Father argues that he did not realize Child was in foster care until at least December 2017, if not later, because DHS failed to inform him.[4] Father's Brief at 6-7,

_____

[4] Father's argument on appeal contradicts his testimony during the hearing that he found out Child was in foster care prior to his incarceration and that he turned himself in because he had been living with his sister and hoped that DHS would consider placing Child with her. *See* N.T., 12/13/18, at 72 ("I was staying there at the time, until they told me that I couldn't stay there if [Child] was supposed to come there. So at that time, I was supposed to turn myself in, and that's what I did.").

- 10 -

12. The implication of Father's argument is that he was unaware of Child's whereabouts, had no contact with Child, and apparently made no effort at all to contact Child for approximately a year. This argument only confirms that Father lacks the commitment, maturity, and stability necessary to serve as Child's parent. Therefore, we discern no abuse of discretion or error of law by the trial court in terminating Father's parental rights to Child involuntarily pursuant to Section 2511(a)(2).

We next consider the trial court's decision to terminate Father's parental rights to Child pursuant to Section 2511(b):

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and

citations omitted).

Father argues once again that DHS failed to present clear and convincing

evidence to terminate his parental rights involuntarily. He maintains that DHS

presented little evidence regarding the bond he shares with Child and that

what evidence DHS did present demonstrated that Child was happy to see him

during visits. Father's Brief at 15. Father also emphasizes that DHS did not

present expert testimony regarding the existence of a parental bond. *Id.*

The trial court found as follows at the conclusion of the hearing on April

5, 2019:

> With respect to Father, the testimony was that for the -- almost the entire time [Child] was in care, Father was incarcerated. And there were absolutely no visits and that the only visits occurred after Father came out of prison. And there were only about six or seven visits. In fact, the testimony of CUA was for the entire life of the case there were only six visits. And all of those visits occurred after Father had been released from prison in -- I believe it was, September or October of 2018.
>
> Given that testimony, I am going to find that there is not a significant enough bond between [Child] and Father that would indicate that this court's termination of Father's parental rights pursuant to 2511(b) would cause any detrimental impact to Father. [*sic*]
>
> In addition, this court will find that based on the testimony of CUA, which I found credible regarding the relationship between [Child] and his foster parent, any potential minor issues [Child] may have, if any, of not seeing his father again . . . would be overcome by the relationship that he has with his foster parent. That's a home that he's spent a significant amount of time in.

And, in fact, it would be more detrimental for him to be removed from that home at this point in time.

N.T., 4/5/19, at 29-30.

The trial court's findings contain multiple relatively minor inaccuracies. As detailed above, Father had no contact with Child for over a year and a half after Child's placement in foster care in February 2017. Father's first visit with Child occurred in September 2018. N.T., 12/13/18, at 45, 48-49. Contrary to the court's findings, both this visit and the subsequent visit in October 2018 took place while Father was in prison. *Id.* In addition, Father had more than just six visits with Child during the life of the case. The court's finding that "there were only six visits" appears to derive from the testimony of Ms. Godwin on December 13, 2018, that Father had visited Child six times as of that date. *Id.* at 37. However, it is clear that Father continued to visit with Child after December 13, 2018. While the record does not contain an exact record of attendance, CUA case manager June Morrison testified on April 5, 2019, that she "was just assigned to the case," apparently sometime after January 2019, and that Father had failed to attend four of the nine possible visits since her assignment.[5] *Id.* at 6.

Regardless of the inaccuracies in the trial court's findings, it is clear that Father has had only minimal contact with Child. Mother testified that Father

---

[5] Ms. Morrison acknowledged that Father called in advance and "let me know why he did not make those visits." N.T., 4/5/19, at 13.

was largely uninvolved with Child during the first year of his life. *Id.* at 96 ("He got involved when he was three days old to a month old, and then from a month old to one and a half, he stopped."). The court placed Child in foster care when he was a year old, and Child did not see Father again until he was over two and a half years old. Any subsequent contact between Child and Father was sporadic. While Child responded positively to Father during their limited interactions together, the record is still more than sufficient to support the court's conclusion that Father and Child do not share a significant bond. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").[6]

As the trial court explained, another critical factor in its Section 2511(b) analysis was Child's positive relationship with his pre-adoptive foster family. *See T.S.M.*, 71 A.3d at 268 ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). Child resided in the same foster home throughout his placement. N.T., 12/13/18, at 41-

---

[6] It is important to note that the trial court did not need expert testimony in order to reach this conclusion. *See In re K.K.R.-S.*, 958 A.2d 529, 533, (Pa. Super. 2008) ("In analyzing the parent-child bond, the [trial] court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert.").

42. Ms. Godwin testified that Child is affectionate with his foster family and comfortable in the home. *Id.* at 42. Further, Child has a positive relationship with the other foster child in the home who is "also going to be adopted . . . if not already adopted[.]" *Id.* at 44. Given this evidence, we discern no abuse of discretion of error of law by the court in terminating Father's parental rights to Child involuntarily pursuant to Section 2511(b).

Based on the foregoing analysis, we conclude that the trial court did not abuse its discretion or commit an error of law by terminating Father's parental rights to Child involuntarily. In addition, Father waived any challenge to the order changing Child's permanent placement goal from return to parent or guardian to adoption. We therefore affirm the April 5, 2019 decree and order.

Decree affirmed. Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/16/20